UNITED STATES of America

v.

Elizabeth G. AUSTIN.

No. Cr–122–G–62.

United States District Court
M. D. North Carolina,
Greensboro Division.

Sept. 28, 1962.

William H. Murdock, U. S. Atty., Greensboro, N. C., for the United States of America.

Thigpen & Hines, Charlotte, N. C., for defendant.

STANLEY, Chief Judge.

On April 12, 1962, defendant was charged in a 30-count indictment with wilfully aiding and assisting in the preparation and presentation of false and fraudulent income tax returns for others during the calendar years 1957 and 1958, in violation of Section 7206(2) of the Internal Revenue Code of 1954, 26 U.S.C. § 7206(2). On June 4, 1962, the defendant moved for an order suppressing as evidence all information obtained from her, and from all other sources by the use of information so obtained, by agents of the Internal Revenue Service.

The motion was heard on July 19, 1962, at which time both parties offered

oral testimony and introduced into evidence certain exhibits. The parties have also filed briefs in support of their contentions.

## FACTS

█ There is some conflict in the testimony as to what took place between the Government agents and the defendant, but from all the evidence presented, including the exhibits, and the briefs and oral arguments of the parties, the following facts are found:

1. For about 20 years the defendant has engaged in the practice of preparing income tax returns for others. She never signed the returns or otherwise indicated they were prepared by her. During the years in question, the defendant had approximately one thousand customers for whom she prepared state and Federal income tax returns. She was also a partner with her husband in a general insurance agency business.

2. On the morning of June 5, 1958, Internal Revenue Agents James C. Watts and Harold J. Huey went to the office of Austin's Insurance Agency, at Kannapolis, North Carolina, a business operated by the defendant and her husband as partners, for the purpose of obtaining records relating to the work of the defendant in preparing income tax returns for others. The defendant was not in the office. After identifying themselves, the agents advised defendant's husband that their visit was in connection with Federal income tax matters. Defendant's husband advised the agents that all tax returns were prepared by the defendant, and that their business should properly be discussed with her. Defendant's husband then called defendant by telephone and advised of the presence of the agents, and the nature of their business. The defendant arrived at the office of the insurance agency a short time later, and was again told by the agents that they were there to investigate her Federal income tax matters.

3. The defendant invited the agents into a small office in the rear of the building where she presented them with certain partnership records, and copies of personal tax returns she had prepared on behalf of herself and husband. The agents then made inquiry concerning work papers in connection with tax returns prepared for the public. When she produced only a slip of paper from her billfold upon which was written "4,132.00 – tax receipts 1958," the defendant was asked if she did not have other records or work papers concerning tax returns she had prepared for others. She then took the agents to a file containing some seventy-five envelopes, and upon further inquiry, stated she had additional records at her home. After defendant offered to go to her home for these records, she readily agreed that Agent Watts might accompany her. Some sixteen boxes of work papers were brought by Agent Watts from the defendant's home to the office of the insurance agency. The agents spent the balance of June 5 and most of June 6, in a room made available by the defendant, examining the work papers pertaining to tax returns which the defendant had prepared for others. The defendant was present on several occasions during this two-day period and observed the type of work the agents were doing. Names and addresses of many customers of the defendant were recorded on a selected basis.

4. On the afternoon of June 5, 1958, before leaving the premises of the insurance agency, the agents gave the defendant the following written memorandum:

"In connection with the examination of your Federal income tax matters, it will be appreciated if you will furnish the following information:

"1. Since your only record covering income from your work in preparing Federal and State tax returns is a 2-inch by 3-inch slip of paper, delivered to us from your billfold, and marked:

" '$4,132.00 – Tax receipts, 1958' it is requested that you furnish a list of your 1956 and 1957 clients by

name and address, together with the amount each paid you for tax work (State and Federal) of any nature.

"2. The manner in which you use your clients prior years working papers (your specially printed forms) in preparing current years returns.

"3. It is noted that in many of your clients working papers you have notations similar to the following:

" 'Short $334.00', or

" 'Short 111.00.'

"These two notations appear on the working papers of James Reese, and Ray Ketner Fink. Please explain.

"4. It is noted that you do not indicate on the returns of your clients that such returns were prepared by your office. Please explain.

"Please furnish these explanations in your memorandum covering your client lists."

5. On June 19, 1958, thirteen days after being presented with the memorandum on June 6, 1958, the defendant mailed the agents a list of the names and addresses of her tax clients for the years 1956 and 1957, as they had requested. This was the last contact the agents had with the defendant concerning her records.

6. Other Internal Revenue agents later investigated the personal income tax returns of the defendant and her husband for the years 1955 through 1958, after which deficiencies were assessed. The deficiencies were subsequently compromised by the payment of additional tax for each of the four years, but no fraud penalty, either civil or criminal, was asserted.

7. At no time during the visits of the agents in the office of the insurance agency on June 5 and 6, 1958, nor during the visit of Agent Watts to the home of the defendant on June 5, 1958, did either of the agents speak in a threatening tone to the defendant or her hus-

band, or in any way threaten or intimidate them. The agents never told the defendant or her husband that they were investigating their *personal income tax returns*, but, as earlier stated, advised that their visit was in connection with *Federal income tax matters*.

8. All the information and records obtained by the agents from the defendant on June 5 and 6, 1958, were freely and voluntarily supplied by the defendant, and the agents did not practice any fraud or deceit in obtaining such information and records.

9. After interviewing some of the taxpayers for whom the defendant had prepared income tax returns, Agents Watts and Huey, on June 24, 1958, recommended that the entire investigation be referred to the Intelligence Division of the Internal Revenue Service for further handling.

## DISCUSSION

The only material conflict in the evidence relates to what the agents told the defendant and her husband on the morning of June 5, 1958, in regard to the purpose of their visit, and whether the defendant was induced to deliver to Agent Watts the work papers in her home by threats or coercion.

The defendant and her husband state the agents advised on the morning of June 5 that the purpose of their visit was to check their personal income tax returns, and at no time did they suspect that the true purpose of the visit was to examine the files of the defendant's tax customers. The defendant insists that if she had known the true purpose of the visit, she would have sought the advice of counsel before making the records available to the agents. It is not controverted that the agents, without notice, appeared at the office of Austin's Insurance Agency on the morning of June 5 with copies of the defendant's 1955 and 1956 income tax returns, for the purpose of procuring a list of defendant's tax customers. The agents say they told the defendant and her husband that they were there to investigate

their Federal income tax matters, not personal income tax returns. On the afternoon of June 6, after they had finished making a list of the names and addresses of some of the defendant's customers, the agents left a written memorandum with the defendant requesting certain information in connection with their examination of her "Federal income tax matters." It is improbable that the agents would have used one expression on June 5 and an entirely different expression on June 6 when they were seeking the same information for the same purpose on both occasions. From all the evidence, the Court is satisfied that the defendant was never told that her personal income tax returns were being investigated.

The defendant filed affidavits tending to show that the agents said to her, in a threatening tone, that she had better produce the records they wanted to see as they would get them anyhow. The agents testified that no threats or coercion whatever were used, and that the defendant freely and voluntarily made her records available. At the hearing, the defendant testified that the agents demanded the records located at her home but that she did not object to their production. She was uncertain as to whether the records were produced because they were demanded, since, as she stated, she had no objection whatever to their production. The defendant further testified that the agents showed her their credentials, that she had no objection to turning the records over to them, and did not object to their seeing and examining and taking the records to her office, as she had nothing to hide. In this connection, the defendant testified as follows:

"Question: Did you turn them [the records] over to him?

"Answer: Yes.

"Question: Did you object to turning them over to him?

"Answer: No.

"Question: Did you object to his taking them to your office? He did take them to your office?

"Answer: No, I did not.

"Question: He didn't take them to the office?

"Answer: He did take them to the office.

"Question: You did not object?

"Answer: Yes. I did not object.

\* \* \* \* \* \*

"Question: Did you object to their using the basement to do their work there?

"Answer: No.

"Question: You had nothing to conceal?

"Answer: That's right.

"Question: And you knew that they were agents, and you knew that they were entitled to examine the records, didn't you?

"Answer: Yes.

\* \* \* \* \* \*

"Question: You did not object to their having these records, or seeing them, or examining them?

"Answer: That is true.

\* \* \* \* \* \*

"Question: You say had you known that they were checking the returns of your clients, you would not have given them to them?

"Answer: No, sir, I would have obtained legal counsel.

"Question: Was there anything about the returns of your clients that you did not want them to see?

"Answer: Not a thing in the world.

\* \* \* \* \* \*

"Question: Did you object to giving them anything that you gave them on June 5 and 6?

"Answer: You mean, did I voice objection to them?

"Question: Did you have any objection to giving them?

"Answer: No.

"Question: And you did give it to them without objection?

"Answer: Yes.

\*   \*   \*   \*   \*   \*

"Question: Did you have any objection to giving them the names and addresses of your clients?

"Answer: No.

"Question: Did you have any objection to giving them this information about the working papers?

"Answer: No.

\*   \*   \*   \*   \*   \*

"Question: You had nothing to conceal, and you say you voluntarily turned over, freely and voluntarily furnished them all the information requested of you?

"Answer: I did."

This testimony, along with other testimony of a similar import, completely negates any suggestion that the defendant was induced to produce her records through threats or coercion,. and clearly establishes that the records were turned over freely and voluntarily.

The defendant knew, or should have reasonably suspected, that the agents were interested in her customer list rather than her personal income tax returns. This list, rather than files relating to her own income tax return, was examined in her insurance office for the greater part of two days. She was present much of the time. A person of the defendant's intelligence and experience in tax matters should have known that the interests of the agents were far greater than the tax return filed by herself and her husband. After working with her customer's files for the better part of two days, the agents requested that the defendant furnish them with a list of her 1956 and 1957 clients by names and addresses, together with the amount each paid her for tax work, and the manner in which she used her clients' prior years work papers in preparing current returns. Explanations of certain notations appearing in the work papers of her customers, and her reason for not signing the tax returns she prepared for others, were requested. This memorandum was certainly sufficient to apprise the defendant as to the nature and purpose of the investigation. Notwithstanding this, she says she freely and voluntarily prepared and furnished the customer list, and gave the explanations requested. Here again, this negates any suggestion of deceit, intimidation or coercion, and any suggestion that the customer list was not freely, voluntarily and understandingly furnished. The Court is convinced that allegations to the contrary are nothing more or less than after-thoughts.

The test to be applied in considering the defendant's motion is found in the case of Turner v. United States, 4 Cir., 222 F.2d 926 (1955). There, as here, the contention was that revenue agents who secure the consent of a taxpayer to examine his books and records with intent to obtain the evidence and use it in a criminal prosecution, are guilty of deceit unless they divulge their purpose. This contention was rejected, and it was held that the applicable rule of law would not support the defendant's position since the agents made no investigation to which the defendant did not consent. The Court then stated, at page 931:

"The relevant inquiry is always whether the taxpayer freely gives his consent, and as to that there is no dispute in this instance."

The agents made no attempt to hide their official identity, or the purpose of their visits. While it is true that the explanation of their purpose was rather indefinite, it cannot be said that there was any fraud or deceit practiced. The defendant knew that her books were sought for investigation by officials of the Internal Revenue Service, and with that understanding she made the books available. A statement that the investigation concerned Federal income tax matters is not the equivalent of saying that only personal income tax returns

were involved. The most that can be said of the defendant's position is that she did not understand the purpose for which the agents were visiting her office. If she had made an inquiry, and positive fraud or deceit had been practiced, another question would have been presented.

■■ The agents were not required to warn the defendant that she did not have to give any information, and that any information she supplied might be used against her in a criminal prosecution. United States v. Frank, 3 Cir., 245 F.2d 284 (1957). The only limitation is that the agents must not practice any affirmative misrepresentations, fraud or deceit. If such is not done, and the defendant freely and voluntarily produces her records, there has been no violation of constitutional rights. Russo v. United States, 2 Cir., 241 F.2d 285 (1957); United States v. Sclafani, 2 Cir., 265 F.2d 408 (1959). Even if the defendant was ignorant of her rights, such would not constitute a basis for the suppression of evidence in a case of this type. Grant v. United States, 2 Cir., 291 F.2d 227 (1961). The defendant had the burden of showing that she has been deprived of some constitutional right, and this burden she has failed to meet.

And finally, since there was good reason for the Internal Revenue agents to suspect fraud on the part of the defendant, or the taxpayers for whom she had filed returns, or possibly both, it appears that the District Director could have obtained the records in question through the use of a summons pursuant to the provisions of 26 U.S.C. § 7602. Wall v. Mitchell, 4 Cir., 287 F.2d 31 (1961); Boren v. Tucker, 9 Cir., 239 F.2d 767 (1956); Falsone v. United States, 5 Cir., 205 F.2d 734 (1953).

### ORDER

It having been concluded that the defendant has failed to establish a basis for her motion to suppress, IT IS OR-DERED that said motion be and same is hereby denied.